IN THE MATTER OF THE APPLICATION FOR DRAINAGE OF LANDS BETWEEN LOWER CHATHAM AND LITTLE FALLS, IN THE COUNTIES OF PASSAIC, ESSEX, AND MORRIS.

1. The right of the legislature to intervene for the drainage of lands of a certain character, such as contemplated in the act of March 8th, 1871, entitled "An act to provide for the drainage of lands," cannot now be questioned in this court. The purpose is sufficiently public to justify the exercise of both the power of eminent domain and of taxation.

2. When the language of an act is equivocal, it is the duty of the court to sustain rather than defeat the act, if it can be done consistently with the guarantees of the constitution, or with fundamental law. The law should be considered valid, unless it can be clearly shown to be in conflict with these. Whether, under this act, it was intended to authorize an assessment upon the land-owners exceeding the benefit received, is a question of legislative construction.

3. The legislature has the right to delegate to the board of managers of the geological survey, the discretion of determining the purpose for which the right of eminent domain should be exercised. The power of eminent domain belongs to the legislature, and is not judicial in its nature. The legislature should be controlled by the courts only when it is clear that the purpose is not of a public nature.

4. The provisions in this act for compensation to land-owners, held to be sufficient. The commissioners must pay the amount awarded by them before they can take possession of the property in question and execute the work. An appeal to a jury is not a matter of right. The provision in the constitution, (*Art. I.,* § 7,) that the right of trial by jury shall remain inviolate, does not interfere with such modes of ascertaining damages for lands taken by eminent domain as the legislature could provide before its adoption.

5. Question of notice considered, and directions given.

On application for the appointment of commissioners, &c.

On the 8th day of March, 1871, "An act to provide for the drainage of lands" was passed by the legislature of this state. The act provides that the board of managers of the geological survey shall, on application of at least five owners of separate lots of land included in any tract of land in this state, which is subject to overflow from freshets, or which is usually in a low, marshy, boggy, or wet condition, are authorized to examine such tract, and if they find it for the interest of the public or the land-owners to be affected thereby, are authorized, from time to time, to make surveys of any such tracts, and to adopt a system of drainage for draining the same, and to cause a map of the same, together with the plan of drainage by them adopted to be made, and make a report of their proceedings to the Supreme Court as soon as can be reasonably done, upon reasonable notice given to that effect, and published in a newspaper circulating in the county where such tract of low land is situate, to appoint three commissioners to superintend and carry out the drainage of any particular tract or tracts aforesaid. And if, at the time fixed for the appointment of such commissioners, it shall appear to the court, in the written remonstrance of a majority of the said low and wet land-owners, that they are opposed to the drainage thereof at the common expense, then the court shall not appoint such commissioners as directed, &c.

On the 6th of June, 1871, the board of managers of the geological survey made a written report to the Supreme Court, setting forth in substance that, on the application of M. P. Crane, Zenas E. Crane, and others, more than five

owners of separate lots of land included within the tract of land in this state, situate in the counties of Passaic, Essex, and Morris, lying on each side of the Passaic river and its branches, the Whippany and Rockaway rivers, and extending along Passaic river from Little Falls, in the county of Passaic, to Chatham, in Morris county, and along the Rockaway and Whippany rivers, to Madison, in said county, and embracing an area of drowned and wet lands of thirteen thousand one hundred and ninety-six acres. The report sets forth at large the location and condition of these lands, and of the streams and rivers adjacent to, or connected with them, and the mode and plan of draining the same, and is accompanied by various maps and surveys explanatory of the same.

Notice having been given of an application to the Supreme Court for the appointment of commissioners to carry out the system of drainage in the tract described in the report of the board of managers, pursuant to the act above referred to, remonstrances were filed against any action on the part of this court, alleging a want of legal validity of the act to be performed, and of the plan adopted for its performance.

The matter came up to be heard at November Term, 1871, before Justices BEDLE, DALRIMPLE, and VAN SYCKEL.

For applicants, *J. Vanatta.*

For remonstrants, *A. B. Woodruff* and *B. Williamson.*

The opinion of the court was delivered by

BEDLE, J.  This is an application for the appointment of commissioners by this court, under an act to provide for the drainage of lands, approved March 8th, 1871.  (*Laws*, 1871, *p*. 25.*)

The plan and system of drainage submitted to us by the board of managers of the geological survey, contemplate the drainage of a large district within the counties of Passaic, Essex, and Morris, lying on each side of the Passaic river and its branches, in Whippany and Rockaway rivers, and extend-

* *Rev.*, p. 662.

ing along Passaic river from Little Falls, in Passaic county, to Chatham, in Morris county, and along the Rockaway and Whippany to Madison, embracing an area of drowned and wet lands of thirteen thousand one hundred and ninety-six acres, and extending from north to south thirteen miles, and from east to west three and a half miles. Through this extent of land the meanderings of the Passaic are about twenty-three miles. The descent of the water of that river as now shown from Lower Chatham to Little Falls, is three and a half inches to the mile, and the object of the plan is to secure a descent of seven and a half inches to the mile, and also a greater descent thereby in the Rockaway and Whippany rivers.

The chief impediments in the Passaic, as set out in the report of the board, are a stone dam at Little Falls, built across the stream near the top of the falls; also a reef of rocks a short distance above the dam, and also a bar of earth and boulders across the river, just above the mouth of Pompton river, at Two Bridges. Besides these, are obstructions of less seriousness, caused by too narrow water-ways in bridges; also numerous bars and mud-banks throughout the river. To effect the object intended, it is proposed to lower the stone dam seven feet; also to cut away the reef five and three-tenth feet below its present level, and so as to make the water-way two hundred feet wide; also to cut a passage way through the bar above Two Bridges one hundred feet wide; also to enlarge the water-way at all the bridges. It is then supposed by the board that the more rapid flow of water will smooth down some of the inequalities in the bed; or, should it be found necessary, that they could be removed at a small expense. The board also expect, by the means stated, to increase the velocity of the stream by something more than one-half its present rate. Other matters, incidental to the main plan, are also referred to in the report of the board, but sufficient is already stated to develop the scope and chief means of the system proposed.

The great object of the enterprise is to reclaim the lands within the district stated from their present wet condition,

and to fit them for cultivation and habitation—the report showing that they are now generally unfit for residence; that they generate chills and fever, and that the chief growth upon them now is of a coarse, wild grass.

It must be assumed that, in this application, the court is not acting merely ministerially, but in its full judicial capacity. It could not be expected that the legislature intended us to make an appointment of commissioners to carry out any project within the scope of the act, whether in the opinion of the court obnoxious to legal principle or not. We are well satisfied that it is our duty, at the threshold of these proceedings, to determine the questions raised, affecting not only the legal validity of the plan, but of the act itself. Since the case of the *Lodi Water Company* v. *Coster*, in the Court of Errors and Appeals, 3 *C. E. Green* 519, the right of the legislature to intervene for the drainage of lands of the character of these, cannot be questioned. The purpose is sufficiently public to justify the exercise of both the powers of eminent domain and taxation. But it is said that assessment of the expense of the work under section two of the act, is not limited to the benefits, and for that reason it is contrary to the principle of that case. The language is undoubtedly equivocal, but it is the duty of the court to sustain, rather than defeat, the act, if it can be done consistently with the guaranties of the constitution or with fundimental law.

The act should be considered valid, unless it can be clearly shown to be in conflict with these. *Talbot* v. *Hudson*, 16 *Gray* 417.

The Lodi water act was declared void, because it imposed upon the lands to be drained the whole cost of the project, without reference to whether the same would be benefited to that extent or not. Any amount imposed beyond the benefits was regarded as taking so much of private property for public use without compensation, and the court would not permit the land-holder to be subjected to such a risk, in the absence of any provision to prevent it. That kind of improvement, as recently decided in this court, (*State, Sykes, pros.,* v.

*Fuller*, 5 *Vroom* 227,) is distinguished from what are well recognized in the law as local improvements, the whole expense of which may be assessed upon lands peculiarly located, on the presumption that their value is enhanced to the full amount of the cost of the improvement. The enterpise now before us is of the same general character as that of the Lodi water case, and the same principle must be applied. The question, then, is one of legislative construction, whether, under this act, it was intended to authorize an assessment upon the land-owners exceeding the benefits. By section two it is provided that, after the work is completed, the expense thereof including the pay of the commissioners and the expense of the board of managers, shall be made up by the commissioners, and returned to the Supreme Court in a report to be made by them, together with a general outline description or delineation of the lands and territory which, in their judgment, ought to contribute to the expense; after which, notice is to be given for any person interested to examine the same and file objections, which objections this court is to determine in a summary way, and thereupon "make a rule or order directing the said commissioners to distribute and assess the amount of said expense and interest upon the lands contained within the territory reported by them originally, or as corrected by the Supreme Court, *in proportion, as near as they can judge, to the benefit derived from said drainage by the several parcels of land to be assessed, &c.*

This language is susceptible of two constructions : one, that the whole expense is to be assessed upon the lands, considering the benefits only so far as fixing the proportion of the cost each land-owner shall pay, whether it actually exceeds the benefits or not; the other is, that the basis of the assessment is the benefits, and that each land-owner should be assessed only to that extent. This act was passed in 1871, and the Lodi water case was decided in 1866. It would require very distinct language to induce us to believe that the legislature intended to violate the principle of that case. Instead of that, it seems that the language, although of doubtful con-

In matter of application, &c., between Lower Chatham and Little Falls.

struction, may have been used with reference to it, and to avoid its difficulties. The words, "in proportion to the benefit derived from said drainage," may naturally be construed to mean such portion of the expense and interest as will be according to the benefit received, making the benefit the measure of the portion to be assessed, and the amount not to exceed such benefit. This construction will sustain the act in its application to all plans of improvement within its scope, while the other will defeat, or greatly cripple its objects.

Under these circumstances, the court should not hesitate to relieve the act from that construction which would bring it within the Lodi water case. It is quite evident that the legislature expected that any improvement undertaken by virtue of this act, would benefit lands to the whole amount of the expense ; for the commissioners, by section five, are authorized to borrow money to make the improvement for the payment, and to issue their bonds therefor, and to pledge the assessment for the payment of the same without any personal liability on the part of the commissioners, and without any provision for the payment of the bonds outside of the assessment upon the lands.

But this is not enough to compel the court to limit the act to such enterprises as from their very nature alone, and at their inception, the court could or would benefit land to the full amount of their cost. As long as the land-owner is protected from any assessment beyond the benefits, the mere contingency that there may be an excess of cost over benefits, unprovided for, is no reason why the court should exclude the enterprise from the scope of the act; those who advance the money and take the bonds, may well be allowed to risk the consequences of any such contingency, should it happen. The act, in its application to the plan of drainage before us, can have effect with safety to the land-owners ; for, if the cost should, perchance, exceed the benefit, they will not suffer.

It is also urged against this act, that the legislature, in the first section, has delegated to the board of geological

survey the discretion of determining the purpose for which the right of eminent domain shall be exercised. This objection comes from those whose lands or property are to be taken for the improvement, and the argument is based upon the fact that every tract of land, (even if five owners of separate lots should apply for its drainage,) which is subject to overflow from freshets, or which is usually in a low, marshy, boggy, or wet condition, is not sufficiently a matter of public interest to justify the taking of private property for its improvement, and that whether so or not, the board of managers of the geological survey have been entrusted with the power of determining it. It may be assumed that the power of eminent domain belongs to the legislature, and is not judicial in its nature. The power of the courts can be called into action only to see that, under color of its exercise, the right of private property is not interfered with, except for public use, and then upon compensation. And on the question of public use, the legislature should be controlled by the courts only when it is clear that the purpose is not of a public nature.

That the exercise of the power of eminent domain, speaking generally, may be delegated by the legislature to corporations, commissioners, or individuals, is too well settled for dispute; but a distinction is sought to be drawn between the exercise of the power as to the time and mode of its exercise, and a determination of the public purpose by delegated bodies or persons. As, for instance, it is conceded that the legislature may authorize surveyors of highways to be appointed by the court, when certain freeholders think a public road necessary, to lay out the same, on their determination whether the road is necessary or not; but that a public road being in its nature for a public purpose, the mode by which it may be laid out, and the the circumstances when, are only delegated, and not the determination of the purpose.

It might well be questioned whether the legislature could allow an indiscriminate exercise of this power on the mere judgment of others, without some reasonable limitation or in-

JUNE TERM, 1872.     505

In matter of application, &c., between Lower Chatham and Little Falls.

dication of the subject matter upon which it was to be exercised ; but that need not now be decided.

There are many subject matters verging closely upon the line where public interest is to be subserved, and where private interest only is to be advanced, and a liberal discretion should be allowed to the legislature as to the means by which it may be decided. The power is eminently practical, and the legislative body not always calculated to decide upon the public utility of an improvement. It may be exercised under general laws, as well as by special act, and probably it is as little liable to abuse, to say the least, under the former as the latter. *Backus* v. *Lebanon,* 1 *N. H.* 19. It not being a judicial power, but legislative, there is no reason why more should be required as to the purpose, in this class of improvements, than a reasonable indication of legislative will, that certain kinds of lands may be improved whenever selected or designated persons shall determine that the public as well as the private interest require it, and to run a distinction between what is for a public purpose, *per se,* and what may be such purpose according to the actual condition, in fact, of a body of land, as it may be ascertained by agents more practical and better able to judge than the legislature itself, is without any solid reason, and will conduce to no public good, or the protection of private rights, when it is remembered that the courts are adequate to prevent any abuse of the power by those to whom its exercise is committed. And, besides, in reality, every road applied for is not, *per se,* of a public character. Whether so or not, must be decided by the surveyors, and there is no substantial difference between that and the case before us. The legislature has declared, in the act in question, that on application of at least five owners of separate lots within any tract of land subject to overflow from freshets, or which is usually in a low, marshy, boggy, or wet condition, the board are authorized to examine the same, and if they shall deem it *for the interest of the public and of the land-owners to be affected thereby,* to make surveys, &c.

The improvement of all such lands may not justify the

right of eminent domain by reason of the want of public interest, but such of them as the public interest may require, the legislative will has reasonably been indicated that they may be improved, and they are ascertained and defined when the proper number of owners apply, and the board shall so consider. There is no real difference between this case and that of a public highway, or various other objects, the public character of which may depend upon an ascertained condition of things, and which may be carried out as well by general acts as by special designation of the property to be taken, and the purpose. The following references will aid in the conclusion reached on this point: *Potter on Statutes* 383; *Smith on Statutes*, § 331; *Backus* v. *Lebanon*, 1 *N. H.* 19; *People* v. *Smith*, 21 *N. Y.* 595; *Beekman* v. *S. & S. R. R. Co.*, 3 *Paige* 45; *Bloodgood* v. *M. &. H. R. R. Co.*, 18 *Wend.* 10; *Morgan* v. *Monmouth Plank Road Co.*, 2 *Dutcher* 107. The court cannot see that any reason exists why the legislative purpose is not sufficiently declared to justify the power of eminent domain in an enterprise like the one before us.

The next question is, whether a proper provision is made for compensation for private property to be taken. This, in itself, if the provision were insufficient, ought not to prevent us from making the appointment of commissioners, as they may agree with the land-owners upon the compensation, and make payment thereof. Such an opportunity should not be excluded by a refusal to appoint. *Morgan* v. *Monmouth Plank Road Co.*, 2 *Dutcher* 109. But there seems to be no real diffiulty about the act in this respect.

By section four, the commissioners must estimate and appraise the damages; and, although an appeal to a jury is allowed from their award, yet, by the necessary construction of that section, they must pay the amount awarded by them, before they can take possession of the property in question, and execute the work. This payment is a condition precedent to the taking, and thereby the compensation fixed by the commissioners is secured to the owner for his property. But,

inasmuch as an appeal is given, and if the amount found by the jury should exceed the award of the commissioners, the land-owner could only depend upon the assessment as his security for such excess, (see section four;) and as there may be a contingency that the whole cost of the work would exceed the benefits, and which difference might be unprovided for, as the act now stands, it may be said that compensation is not therefore sufficiently secured. The answer to that is, that an appeal to a jury is not a matter of right. The provision in our constitution, (*Art. I.*, § 7,) that the right of trial by jury shall remain inviolate, does not interfere with such modes of ascertaining damages for lands taken by eminent domain, as the legislature could provide before its adoption. The usual mode is by commissioners, and is not prevented by the organic law; the same is within the power of the legislature. 1 *Redfield on Railways* 270, § 72. The cases in 2 *Green*, of *Bennett* v. *C. & A. R. R. Co.*, 147, and *Van Wickle* v. *Same* 163, ought to be considered as settling in this court, although not in terms saying so, yet by necessary force, that an appeal to a jury is not a matter of right; it was allowed in those cases for other reasons than that. The charter of the Camden and Amboy company provided for a jury after an award by the commissioners for good cause shown, and those words were regarded as requiring reasons for the granting of the jury other than of the mere right to it as of course. The case of *Bonaparte* v. *Camden and Amboy R. R. Co.*, *Bald. C. R.* 20, sustains the same view. See also *Angell on Water Courses*, § 475, note *x;* and in the case of *Doughty* v. *S. & E. R. R. Co.*, 1 *Zab.* 452.

Judge Randolph uses this language: "But it is insisted that the tender shall not be made till there is an end of litigation, and the amount of damages be finally assessed by a jury; but if the legislature have a right to say that a tender of the amount found by a jury shall be considered compensation, they must also have the right to say that a tender of the amount awarded by commissioners will have the same effect, and the additional trial allowed cannot render that un-

constitutional which before was constitutional." It may therefore be concluded that the constitutional provisions for just compensation is complied with, on payment of the award of the commissioners, and that if an appeal to a jury is allowed, the party accepts it with the provision for the collection of any increase over the award from the assessments, and that if by a possibility contrary to what the legislature supposed, in any improvement undertaken by virtue of the act, the whole amount to be assessed should exceed the benefits, that risk the party takes when he accepts the appeal. He is sure of the payment of the award of the commissioners at any rate, before his property is taken.

The objection that the word "tract" in section one, was not intended to include a district or body of land of the size of this is, we think, untenable. The word tract may well embrace a district or large section of the same class of land described in the act, and lying in a body.

This disposes of the more substantial questions raised; the rest are less important. We will consider, first, the notice :

The land lies in three counties, and publication was made in two newspapers in each; no other notice was given. Regularly, the notice should be by direction of the court, but that could be dispensed with, and such notice as had been given be adopted, provided that, in the judgment of the court, it were reasonable, and properly published. The remnant of section one, as to notice, is in these words : "Upon reasonable notice given to that effect, and published in a newspaper circulating in the county where such tract of low lands is situate." The publication in at least one newspaper in each county is indispensable; and, besides that, such other notice must be given as the court may deem reasonable under the circumstances of each case. The sufficiency of the notice as to the time, mode, and character, are all within the judgment of the court. This application has not been sufficiently noticed, as there was only a publication in the newspapers. The court think that there should be a re-publication in the several newspapers in which the notice has been already pub-

lished, being two in each county, for at least six weeks previous to the first day of the next term of this court, at least once in each week. Also that the same notice, written or published, be set up in five of the most public places in each of the townships in which the tract lies, and nearest thereto, for the same length of time at least before next term, which notices, in addition to what appears in those before us, should generally describe the tract so that it may be reasonably identified as to its location and general boundaries, and also should give a general statement of the plan of drainage proposed, so that it may reasonably be understood, without requiring the land-owner to come to Trenton to examine the same in order to get a general knowledge of it; these are important, that the land-owner may know that he is interested, and determine whether to remonstrate or not. *The State, Coar, pros.,* v. *Jersey City, ante p.* 404.

This question of notice affects not only the owner whose land is to be drained, but also him whose property is to be taken. It will be seen that the same commissioners appointed to execute the work are the persons to make the award of damage. It will therefore be wise to avoid any question in the respect following, and to give special notice to all persons whose property may be taken or damaged under section four. Such notice may be by personal service, or by leaving the same at their places of abode respectively, if in the state, or if not, by the same service, or by mailing the same to such persons respectively, at their usual post-office, if ascertained, and if not, then by publication in the newspapers, in the same way as the notice first mentioned. This notice whether served, mailed, or published, to be for four weeks previous to the next term. No opinion is expressed as to the absolute necessity of this special notice. As to notice for the adoption of the plan by the board, none is required by the act, and we think it is not necessary.

2. The names of the owners of the separate tracts do not appear upon the maps. The act does not direct this, and it would be impracticable to require it with any special accuracy.

When the assessment is to made under section two, the parcels may be designated by the names of the owners or the occupier, or in such other manner as may be most convenient in such case, and the assessment will be a lien upon the same, without regard to who the owners may be. Certainly no stricter rule than that should be required as to the maps of the board. It is desirable to have the owners' names, so far as the board can conveniently ascertain them, in order that the court may the more readily determine whether the owners of a majority of the lands had remonstrated, without the necessity of resorting to extrinsic evidence. Any owner, by reference to the maps, can reasonably ascertain the location of his land by using the scale, meridian, monuments, and lines thereon, and the court could take evidence, if necessary, to indentify the owners with the several tracts, as their lines appear upon the maps. It is reasonable, however, that the board should put down the names of the owners, as far as practicable, and for that purpose they may take the maps from the files, and return them, when done, in time to be on file when notice is given.

3. The application of the owners to the board is not produced. The report recites that such application was made. The application, we think, should be in writing; also, it is said, that the same (in writing) can be produced by the board, if necessary, or proved, if lost. The statute does not require the same to be returned to the court. The board are merely bound, when their survey and maps and plans are completed, to make a written or printed report of the same to the Supreme Court, and then it becomes the duty of the court to take action thereon. (Section one.) The fact of the application can undoubtedly be controverted, but, until the contrary appears, it will be assumed from the recital in the report, that the application was properly made. The board can produce the same at the next term, if in existence; and, if not, should the fact be disputed, the court would have the right to direct a proper inquiry.

All the matters to which our attention has been directed

have been referred to, and the views of the court given, that the proceedings may not be further delayed, except as it may be necessary to correct the irregularities and defects already stated. The application will be continued to the next term for that purpose, and an order entered in accordance with this opinion.

CITED *in State, D., L. & W. R. R. Co., pros.,* v. *Passaic,* 8 *Vr.* 138–538 ; *State' Graham pros.,* v. *Paterson,* 8 *Vr.* 383 ; *State, McCloskey, pros.,* v. *Chamberlain,* 8 *Vr.* 394 ; *In matter of drainage along Pequest,* 10 *Vr.* 198 ; *S. C.,* 10 *Vr.* 434 ; *State, Hutton, pros.,* v. *West Orange,* 10 *Vr.* 455 ; *Black* v. *Del. & Rar. Canal Co.,* 9 *C. E. Gr.* 473.